IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| **WALTER DAVENPORT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 5:22-cv-074** |
| | ) | |
| **v.** | ) | **By:    Michael F. Urbanski** |
| | ) | **Chief United States District Judge** |
| **HIREPOWER PERSONNEL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on cross-motions for summary judgment. Pl's Mot. Partial Summ. J., ECF No. 58; Def.'s Mot. Summ. J., ECF No. 61. The motions are fully briefed, and the court heard argument on April 12, 2024. For the reasons provided below, defendant HirePower Personnel, Inc.'s Motion for Summary Judgment, ECF No. 61, is **GRANTED** as to the claims arising under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., (Count One) and the Virginia Wage Payment Act ("VWPA"), Va. Code § 40.1-29 (Count Two), and **DENIED** as to the claim for breach of contract as a third-party beneficiary (Count Three) and the alternative claim for unjust enrichment (Count Four). Plaintiff Walter Davenport's Partial Motion for Summary Judgment, ECF No. 58, is **DENIED**. The case remains set for a jury trial on May 9–10, 2024, on the surviving issues.

## I.  BACKGROUND

The evidence shows that, in November 2015, HirePower—a Texas-based staffing company—entered into an agreement with Computer Task Group ("CTG"), another staffing company, for HirePower to provide an employee to work for IBM at the Anthem data center

in Harrisonburg, Virginia (the "Data Center").[1] In February 2016, CTG provided HirePower with a job description and list of requirements that IBM had compiled for the role. Exh. 9, ECF No. 59-22; Smith Dep., 31:2-20. It stated that the "role is performed by technical professionals who specialize in providing perform services to clients on hardware and software components. Activities include operation and maintenance of operating systems across multiple platforms, middleware applications, various database technologies, high availability solutions and load balancing." Exh. 9, ECF No. 59-22.

The posting also required "4+ year[s'] systems administrator experience" and indicated that "Windows certification [is] preferred," along with a nearly two-page list of other "skills required." Id. Eric Luczkow, an IT manager at IBM who interviewed Davenport and selected him for the position, testified that he added certain skills to the job description based on the type of qualified candidate he was seeking, including that experience in "VMWare ESXi 5 or up" and "(VCenter)-Platespin" were preferred. Id.; Luczkow Dep., 29:18-30:21. Luczkow also included on the posting that the role "[s]upport[s] a complex Windows environment with 7[,]000 Windows servers (virtual and physical)," based on his estimation of the entire Anthem network. Id.; Luczkow Dep., 30:8-11. Indeed, Luczkow's goal for including certain items on the posting was to serve as a "wish list," meant to "identify people who have worked in complex environments" to ensure that they had the necessary skills to work at the Data Center.

---

[1] In this memorandum opinion, the court refers to certain information that the parties filed under seal as exhibits in their summary judgment briefing. The court hereby **UNSEALS** the specific portions of those exhibits contained in this memorandum opinion, based on its determination that any confidentiality or other consideration favoring sealing is substantially outweighed by the public's right to access and understand the court's rulings on these motions.

Luczkow Dep., 56:6-25 (explaining that "only people who have worked . . . with a cluster really have had this type of experience").

On February 28, 2016, Davenport executed an offer letter with HirePower for the role, which provided, "You are considered an exempt employee according to the provisions of the Fair Labor Standards Act. This position is not eligible for overtime. Your pay rate is $50.00 per hour for all hours worked." Exh. 10, ECF No. 59-10. In March 2016, CTG and HirePower executed a "Confirmation Letter for IBM Business," in which CTG agreed to pay a certain amount (referred to as a "bill rate") to HirePower in exchange for providing Davenport's services to IBM at the Data Center. Exh. 18, ECF No. 59-27. The letter lists Davenport's name under "subcontractor personnel," and identifies the role as System Administrator with a "skill level" of "Master." Id. The bill rate included an hourly rate to Davenport of $50 along with a markup for HirePower. Id.

In August 2016, Davenport memorialized his job responsibilities in an email to Rose Smith, a program manager at HirePower. Exh. 17, ECF No. 59-26; Davenport Dep., 130:6-14 (explaining that he emailed an accurate list of his job responsibilities to Smith). He provided that his title was "Systems Administrator," and explained that his duties included handling "helpdesk tickets concerning anything to do with servers, whether they are not responding to pings, drive space issues or any other problems they may have," and that "part of [his] duties is to rack any servers that come in and make sure they are connected." Exh. 17, ECF No. 59-26. He added that, because he "is the only one at the Harrisonburg location[,] [he] respond[s] to all outages or server issues in the data center." Id.; see also Davenport Dep., 153:19-22 (estimating that there are 1,500 servers at the Data Center). Finally, he indicated that

3

he is responsible for troubleshooting and remediating issues with hardware and Windows OS, performing virus scan updates and other software upgrades, and that he is also "part of the patching team." Exh. 17, ECF No. 59-26.

Luczkow, who directed Davenport's work in the role, explained that the position required understanding how "middleware applications" interact with the operating systems and how "a database application like SQL run[s] on a Windows box." Luczkow Dep., 39:7-24. Luczkow specified that Davenport was involved in problem solving server issues in Harrisonburg, including performing root cause analysis, and was part of a team that supported the "BigFix" product, a tool that fixes customer issues through automated processes. Luczkow Dep., 51:25-52:6, 61:22-62:18, 97:8-98:15. Davenport was also "on-call" for issues that needed site support at the Data Center, serving as the person responsible for troubleshooting the problem on-site. Luczkow Dep., 67:18-68:1. In addition to being on-call, he also performed tasks that had to be scheduled for after hours. Luczkow Dep., 66:14-19. Davenport and only one other person performed the critical on-site support needed at the Data Center. Luczkow Dep., 171:3-24.

Celeste Glass, who was familiar with Davenport's role as owner of HirePower, distinguished Davenport's duties from those working at a help desk, explaining that he "was working with servers doing systems analyst work," rather than "help desk duties." Celeste Glass Dep., 24:10-14. She added that employees staffing a help desk do not earn wages as high as Davenport's. Id. at 24:16-22 ("[H]elp desk people don't make $50 an hour . . . . They make a lot less. . . . It's more of a simple low-level type of help."). Luczkow similarly testified that

Davenport was not in a help desk role, which serves as "the first line of engagement." Luczkow Dep., 159:22-160:9.

When HirePower got the contract with CTG, HirePower knew that CTG was a "big company" and, because Davenport was HirePower's first hire for CTG, accepted an "extremely low markup . . . to get [its] foot in the door." Celeste Glass Dep., 27:22-29:2. In other words, HirePower was willing to accept a markup that was "a break even or even a loss" for Davenport "in order to get more business." Id. at 28:19-29:2.

In October 2016, Artech Information Systems LLC ("Artech") replaced CTG as IBM's staffing company for the Data Center. On October 20, 2016, HirePower and Artech executed a "Subcontract Agreement for the IBM Organization." Exh. 11, ECF No. 59-23. HirePower and Artech entered into the agreement "to keep [Davenport] employed," Smith Dep., 54:7-19, and because "Artech wanted to continue utilizing [Davenport's] services," David Glass Dep., 52:3-9. Artech agreed to the same wage and markup for Davenport that had been in place with CTG. Smith Dep., 45:20-23 ("[W]e agreed that[,] for Walter Davenport, we would keep his rates as they were without change . . . ."). At that time, HirePower verified on the purchase order that Davenport's wages would be $50 per hour. Exh. 12, ECF No. 59-24.

On May 16, 2017, however, Artech informed HirePower via email that it was reducing its bill rate for Davenport's services. Exh. S, ECF No. 62-36. When Rose Smith protested, John Spry, Vice President at Artech, responded, "[I]t is coming from [IBM] and you will need to cut [Davenport's] rate or his last day will be Friday." Id. Smith forwarded the email to Celeste Glass and David Glass, a consultant for HirePower, asking "I guess Walter's last day is Friday?" Exh. T, ECF No. 62-37. Celeste Glass responded, "Yes, please let him know that

he is terminated effective Friday." Id. However, the next day, Smith again emailed Celeste Glass and David Glass, stating, "I just spoke with Walter and he said he knew something was coming as they are moving a lot to India. He is willing to take $40.00 . . . ." Exh. U, ECF No. 62-38. Celeste Glass responded, agreeing to keep Davenport employed in light of his agreed pay cut. Id. Just three minutes later, Smith emailed Artech and accepted the new bill rate. Exh. V, ECF No. 62-39.

In 2018, Davenport reached out to HirePower multiple times to request a raise. Exh. 15, ECF No. 59-25. In a May 14, 2018, email from Davenport to Smith, Davenport wrote, "I sent an email about a pay raise several months ago, but I have not heard anything back. We are starting a new program called Bi[g]fix which I am involved in[,] along with 24X7 support for the [Data Center.]" Id. at 3. In November 2018, Davenport again requested a pay increase, justifying it by listing his "primary responsibilities," which included "On call 24x7 hands and feet support at the Harrisonburg Data Center; 24x7 escalation for patching and Tier 1 support for the India Team; Racking servers at the data center; IP configuration and cabling; Big Fix administration – Pushing updates and bug fixes to the Anthem Network." Exh. 17, ECF No. 59-26, at 4.

In April 2022, Davenport again emailed HirePower regarding a raise. As justification, he provided that he "[r]ack[s] new servers in the Data center," "[c]onfigure[s] [the] IP address on all new servers or change[s] IPs on current servers," "[d]ecom[missions] servers that are no longer in use," "[p]ush[es] server updates to all the Domain Controllers in the enterprise," and "resolve[s] any issues with servers that do not come back up after patching." Exh. 16, ECF No. 59-16. He again emphasized that he is on call "24/7 365 days a year for any server

problems at the [Data Center]," and that he is also on call "for IBM once ever[y] 5 weeks to handle any outages." Id.; see also Davenport Dep., 135:9-17, 156:3-18 (explaining that he is "on call 24/7, 365 for stuff that goes wrong at the data center" and also on call "every five or six weeks" for issues that arise across the "whole Anthem network" of 7,000 to 8,000 servers).

That same month, Davenport contacted Artech directly to request a raise, informing them that his hourly wage was $40 and that he was seeking an increase to $45. Exh. 17, ECF No. 70-41; Smith Dep., 122:2-12 (explaining that, prior to Davenport's email, HirePower had not told Artech that it was paying Davenport $40 per hour). On May 20, 2022, Artech explained to Davenport that his $40 hourly wages "are non-compliant;" specifically, "You are not being paid enough and we have reached out to your employer asking them to make this right." Exh. 17, ECF No. 70-41, at 6. Indeed, on May 19, 2022, Artech emailed HirePower with the subject line "13 may paystub – Walter Davenport – NOT COMPLIANT," and stating, "After our internal team[']s review, they see that the wages are **not in compliance** with the Customer's pricing schedules and contractual markups. You will need to correct the wages to **45.00** and provide updated wage verification in their next pay cycle." Id. at 3 (emphasis in original).

On May 23, 2022, HirePower sent Davenport a letter informing him that it was changing his pay rate to $45 per hour, effective that pay period. Exh. 18, ECF No. 70-42. Two days later, Davenport emailed Smith at HirePower, inquiring as to whether he would receive backpay for the additional $5 hourly wages he was owed but had not received since accepting the pay cut in May 2017. Exh. 20, ECF No. 70-44 ("I was made aware of my pay not being compliant as I wasn[']t making the money I was supposed to be making after the paycut.").

After not receiving a response, he followed up twice with HirePower in early June, informing them that he estimated that the total backpay due was $52,000. Id. Mayra Orellana, a recipient of Davenport's backpay request, forwarded the email to David Glass. Id.

Meanwhile, on May 26, 2022, David Glass emailed HirePower's compliance team, asking them to review HirePower's agreement with Artech to determine whether HirePower is "allowed to terminate" Davenport under the agreement. Exh. 19, ECF No. 70-43. The compliance team confirmed that they saw no issue with terminating Davenport under the agreement. Id. On June 6, 2022, David Glass emailed Artech to inform them that HirePower was terminating Davenport's employment. Exh. 22, ECF No. 70-45 ("Please consider this notice that we no longer are willing to work under the pricing and payment model regarding Walter Davenport and would like for you to find a new employer."). David Glass also emailed Davenport that morning, informing him HirePower has "requested that Artech find a new company to work with you or for Artech to hire you directly." Exh. 23, ECF No. 70-46. He continued, "In regard to your question about backpay, the current situation is an issue between HirePower and Artech. You will not be receiving any form of backpay, we are comfortable with the documentation that exists." Id. Artech then hired Davenport so that he could continue working in his role at the Data Center.

Davenport initiated this action by filing a complaint on December 20, 2022. Compl., ECF No. 1. Davenport asserts four causes of action. Count One alleges that HirePower violated the Fair Labor Standards Act ("FLSA") by improperly classifying him as exempt under the "computer professional exemption," 29 U.S.C. § 213(a)(17), depriving him of overtime premium pay. Counts Two to Four are state law claims, alleging that HirePower was

required under its contract with Artech to pay Davenport $45 per hour, instead of $40 per hour, in violation of the Virginia Wage Payment Act ("VWPA"), Va. Code § 40.1-29 (Count Two), and for Breach of Contract as a Third-Party Beneficiary (Count Three), or, in the alternative, for Unjust Enrichment (Count Four). Davenport seeks compensatory damages for the unpaid wages, statutory damages under the FLSA and the VWPA, attorneys' fees and costs under both statutes, and an injunction prohibiting HirePower from any future violations.

On March 8, 2024, the parties filed cross-motions for summary judgment. ECF Nos. 58, 61. Davenport and HirePower each seek summary judgment on the issue of whether HirePower violated the FLSA by classifying Davenport as exempt.[2] HirePower also moves for summary judgment on Davenport's three state law claims; Davenport seeks summary judgment on those claims only as to HirePower's asserted defenses of unclean hands, waiver, laches, and estoppel. The parties filed oppositions to the respective motions, ECF Nos. 70, 73, and replies, ECF Nos. 83, 86, and the court heard argument on April 12, 2024.[3] Accordingly, the motions are ripe for resolution.

## II. LEGAL STANDARD

Under Rule 56, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn

---

[2] Both parties also seek summary judgment on the issue of whether HirePower willfully violated the FLSA, subjecting it to a three-year statute of limitations, 29 U.S.C. § 255, and Davenport moves for summary judgment on HirePower's "good faith" defenses under the FLSA, 29 U.S.C. §§ 259, 260. However, because the court concludes that HirePower properly classified Davenport as FLSA-exempt as a matter of law, these issues are moot.

[3] Following the hearing, Davenport filed a sur-reply to HirePower's argument on the third-party beneficiary issue. Pl.'s Sur-Reply, ECF No. 98.

v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255.

The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477

U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Anderson, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992).

## III.   DISCUSSION

### A. FLSA

Davenport and HirePower each seek summary judgment on the issue of whether Davenport's role at the Data Center fell under the FLSA's Computer Professional Exemption, thereby precluding him from receiving overtime premium pay. Under the FLSA, an employer must compensate employees at one and one-half time their regular rate of pay for all time worked beyond 40 hours in a week. 29 U.S.C. § 207(a)(1). The FLSA, however, recognizes certain categories of employees that are exempted from receiving overtime premium pay. 29 U.S.C. § 213. "The determination of whether an employee falls within the scope of a FLSA exemption is ultimately a legal question," Walton v. Greenbrier Ford, Inc., 370 F.3d 446, 450 (4th Cir. 2004) (citing Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 713–14 (1986)), and "[e]mployers must prove by clear and convincing evidence that an employee qualifies," Shockley v. City of Newport News, 997 F.2d 18, 21 (4th Cir. 1993).

As relevant here, one of the FLSA's exemptions is the Computer Professional Exemption, which provides that overtime premium pay does not apply to:

> any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is—
>
>> (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;
>>
>> (B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
>>
>> (C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or
>>
>> (D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills, and
>
> who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $27.63 an hour[.]

29 U.S.C. § 213(a)(17).

Because it is undisputed that Davenport's hourly rate exceeded $27.63 per hour, at issue in this case is whether Davenport's "primary duty" was the performance of exempt work. See Campbell v. Kannapolis City Sch. Bd. of Educ., 55 F. Supp. 3d 821, 823 (M.D.N.C. 2014), (citing 29 U.S.C. § 213(a)(17) and 29 C.F.R. § 541.400(b)). "Primary duty" under the FLSA means the "principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." Id. The court should also consider a variety of factors, including "the relative

importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." Id.

Courts often look to the responsibilities listed in the job vacancy to identify the employee's primary duty, but emphasize that the determination must be based on an employee's "actual work activities." See, e.g., Campbell, 55 F. Supp. 3d at 824–25 (reviewing the job posting for the plaintiff's position to determine the primary duty, but explaining that, "because job titles vary widely and change quickly in the computer industry," courts must ascertain an employee's primary duty by their "actual work activities" (quoting 29 C.F.R. § 541.400(a) and Cooke v. General Dynamics Corp., 993 F. Supp. 56, 61 (D. Conn. 1997))); Williams v. Genex Servs., LLC, 809 F.3d 103, 110 (4th Cir. 2015) (reviewing the employee's description of the role on her resume to ascertain her actual work activities).

Here, Hirepower argues that Davenport's role was exempt because most of his time was spent supporting, overseeing, and maintaining a "complex environment" of over 1,000 servers at the Data Center, and that he was "on-call" at all hours for server issues that arose. Further, Hirepower emphasizes that he was only one of two IT professionals serving in this role at the Data Center and, every five to six weeks, he was responsible for diagnosing and troubleshooting server issues across the entire Anthem network, consisting of 7,000 to 8,000 servers globally. Davenport, for his part, contends that his responsibilities do not amount to those contemplated by the exemption because his primary duties involved powering servers

on and off, racking and decommissioning servers, installing software, running security patches, and escorting vendors.

Upon careful review of the undisputed facts and relevant caselaw, the court concludes that Davenport's role fell within the exemption. Principally, Eric Luczkow, Davenport's supervisor at IBM, testified that the purpose of Davenport's role was to provide on-site support for a "complex environment" of over 7,000 servers across the Anthem network. Indeed, in creating the list of responsibilities for the job, Luczkow viewed it as a "wish list" that was meant to identify only those people who have worked in complex environments like the Data Center, given that "you don't always get [candidates with] this skill." Luczkow Dep., 56:6-25. Highlighting the skill's value to IBM, he emphasized that "[p]eople can sit in their basement with a little lab all they want and they can . . . learn quite a lot of stuff, but they won't learn what it's like to work in a large data center spanning . . . the entire country in, you know, a network environment with a [nationwide] customer. . . . It's different. It's complex." Luczkow Dep., 53:6-14.

Luczkow also included in the posting that experience with certain computer applications was preferred, including "VMWare ESXi 5 or up" and "(VCenter)-Platespin," given the responsibilities of the position. Exh. 9, ECF No. 59-22; Luczkow Dep., 29:18-30:21. Luczkow further explained that the position required a technical understanding of how "middleware applications" interact with the operating systems and how "a database application like SQL run[s] on a Windows box." Luczkow Dep., 39:7-24. Indeed, as a reflection of the technical skills required for the role, the "Confirmation Letter for IBM

14

Business" that CTG and HirePower executed for Davenport's position identified the job "skill level" as "Master." Exh. 18, ECF No. 59-27.

Evidence regarding Davenport's actual job activities support this higher skill level. Luczkow testified that Davenport was involved in problem solving issues across the 1,500 servers at the Data Center, including "root cause analysis," and was part of a team that supported the "BigFix" product, a tool that fixes customer issues across the network through automated processes. Luczkow Dep., 51:25-52:6, 61:22-62:18, 97:8-98:15. Davenport's own description of the job, which he memorialized by email to Rose Smith at HirePower soon after starting in the position, confirms the integral role he played in troubleshooting server issues in the Data Center, representing that, as "the only one at the Harrisonburg location, [he] respond[s] to all outages or server issues in the data center." Exh. 17, ECF No. 59-26; see also Davenport Dep., 153:19-22.

These responsibilities are consistent with the complex troubleshooting that courts have classified as exempt. See Friedman v. Nat'l Indem. Co., No. 8:16-cv-258, 2018 WL 1954218, at *4 (D. Neb. Apr. 13, 2018) ("[C]ourts have routinely found that analyzing computer systems, troubleshooting complex server issues, and configuring computer networks satisfies the 'computer employee' exemption." (collecting cases)); Edelmann v. Keuka Coll., No. 16-cv-6293, 2019 WL 3816563, at *6 (W.D.N.Y. Aug. 14, 2019) (concluding that the court could not grant summary judgment for the employee because the evidence shows he is "an IT professional whose day-to-day activities involved solving complex computer, server, and network issues"); Clarke v. JPMorgan Chase Bank, N.A., No. 08 Civ. 2400, 2010 WL 1379778, at *17 (S.D.N.Y. Mar. 26, 2010) (finding that an employee was exempt because he was

responsible for capacity management across "about fifty to sixty physical servers and 1,500 virtual servers").

The fact that Davenport was a "go-to" person for all server issues at the Data Center, both during the workday and after hours while "on-call," also supports the court's conclusion that he falls within the exemption. See Maccheak v. Baptist Health, No. 4:21-CV-01217 BRW, 2023 WL 5669093, at *2 (E.D. Ark. June 13, 2023) (concluding that an employee was exempt because he stated that "he was 'the man' when it came to servers for all of the [employer's] facilities" and that he "periodically consulted with users while being on-call after hours"). In fact, in addition to handling server issues after hours at the Data Center, Davenport was also on-call for one week out of every five weeks to troubleshoot issues across Anthem's entire network of 7,000 to 8,000 servers. Davenport Dep., 135:7-15, 156:3-18 (explaining that he was "on call 24/7, 365 for stuff that goes wrong at the data center" and also on call "every five or six weeks" for issues that arise across the "whole Anthem network"). Davenport, explaining his responsibilities as justification for a request for a pay raise in 2018, emphasized this feature of the job, explaining that he was "[o]n call 24x7 [for] hands and feet support" at the Data Center. Exh. 15, ECF No. 59-25. Again, in 2022, he emphasized that he was on call "24/7 365 days a year for any server problems" at the Data Center and added that he was on call for IBM every five weeks "to handle any outages." Exh. 16, ECF No. 59-16.

Further, Celeste Glass, who was familiar with Davenport's role as owner of HirePower, distinguished Davenport's duties from those working at a help desk, explaining that he "was working with servers doing systems analyst work," rather than "help desk duties." Celeste Glass Dep., 24:10-14. She added that employees staffing a help desk do not earn wages as high

as Davenport's. Id. at 24:16-22 ("[H]elp desk people don't make $50 an hour . . . . They make

a lot less. . . . It's more of a simple low-level type of help."). Luczkow also noted this difference,

explaining that, while Davenport certainly "has interactions with our people who work for our

customer," he was not in a help desk role, which serves as "the first line of engagement."

Luczkow Dep., 159:22-160:9.

This distinction is important, as it is well-settled that help desk employees do not rise

to the requisite level of skill to fall within the exemption. See, e.g., Hunter v. Sprint Corp., 453

F. Supp. 2d 44, 52 (D.D.C. 2006) (concluding that a "technically proficient help-desk employee

whose primary duty was customer service" does not "fall[] within the ambit of" the

exemption); Bobadilla v. MDRC, No. 03 CIV. 9217, 2005 WL 2044938, at *7 (S.D.N.Y. Aug.

24, 2005) (explaining that a jury could conclude that the employee was exempt "because he

had sophisticated knowledge of computing that went beyond that of a non-exempt Help Desk

employee"); Martin v. Ind. Mich. Power Co., 381 F.3d 574, 577 (6th Cir. 2004) (concluding

that the employee's duties fell outside of the exemption because they were limited to

responding to help desk tickets, troubleshooting individual computers, installing simple

software, and checking cables); Allen v. Enabling Techs. Corp., No. CV WMN-14-4033, 2016

WL 4240074, at *9 (D. Md. Aug. 11, 2016) (providing that summary judgment could not be

awarded because the plaintiffs submitted evidence "that their primary duties were equivalent

to those of help-desk employees").

Davenport's education and certifications also support HirePower's conclusion that he

fell under the exemption. See, e.g., Olorode v. Streamingedge, Inc., No. 11 CIV. 6934, 2014

WL 1689039, at *23 (S.D.N.Y. Apr. 29, 2014), report and recommendation adopted, No. 11

CIV. 6934, 2014 WL 3974581 (S.D.N.Y. Aug. 13, 2014) (noting that the employee had "multiple technical certifications that equipped him with valuable training and skills"); Bobadilla, 2005 WL 2044938, at *7 ("The plaintiff had experience related to network management and held a valuable Cisco CCNA credential that would allow him to develop computer systems based on user specifications."); Clarke, 2010 WL 1379778, at *3 (noting that the employee had "earned two technical certifications" prior to starting in the role); Friedman, 2018 WL 1954218, at *4 (acknowledging that the exemption is inappropriate where the job's tasks were those that "an employee, who had no computer certifications or advanced training, could easily manage").

Here, in addition to obtaining a bachelor's degree in system network administration from Bellevue University in 2013, Davenport has also obtained several technical computer certifications, including Windows Server, Administration for Windows, and UNIX Administration. Davenport Dep., 19:9-12, 22:8-23:14. In fact, the initial job posting required "4+ year[s'] systems administrator experience" and indicated that "Windows certification [is] preferred." Exh. 9, ECF No. 59-22. Luczkow likewise confirmed that, given the required skills for the role, he preferred that candidates have Microsoft certifications. Luczkow Dep., 36:6-14.

Further, Davenport's hourly rate, which annualized to a salary of between approximately $83,000 and $104,000, supports the conclusion that Davenport's role was exempt. Indeed, in Williams v. Genex Servs., LLC, the Fourth Circuit affirmed the district court's ruling that the employee was exempt in part based on her salary, noting that the employee's "high salary, over $80,000.00 in the two years preceding this litigation, itself creates doubt as to whether she falls within the FLSA's intended protected class." 809 F.3d 103, 111

(4th Cir. 2015). The court noted that the Fourth Circuit has "previously emphasized that, 'although salary alone is not dispositive under the FLSA, the FLSA was meant to protect low paid rank and file employees.'" Id. (alterations omitted) (quoting Darveau v. Detecon, Inc., 515 F.3d 334, 338 (4th Cir. 2008)); see also Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 166 (2012) ("Petitioners—each of whom earned an average of more than $70,000 per year . . .—are hardly the kind of employees that the FLSA was intended to protect."). The court further explained that even "the FLSA's implementing regulations state that '[a] high level of compensation is a strong indicator of an employee's exempt status.'" Williams, 809 F.3d at 111 (quoting 29 C.F.R. § 541.601(c)); see also Marshall v. W. Union Tel. Co., 621 F.2d 1246, 1251 (3d Cir. 1980) (providing that the purpose of the FLSA is to protect low paid "rank and file" employees, not higher salaried managerial and administrative employees who are "seldom the victims of substandard working conditions and low wages").

Several district court decisions have similarly noted an employee's high salary in concluding that the employee was exempt. See Bobadilla, 2005 WL 2044938, at *3 ($70,000 annual salary with a $5,000 signing bonus); Campbell, 55 F. Supp. 3d at 823 (annual salary of $60,000 to $70,000); Clarke, 2010 WL 1379778, at *3 (annual salary of $78,850 to $101,931); Olorode, 2014 WL 1689039, at *22-23 (annual salary of $53,000 to $60,000); Friedman, 2018 WL 1954218, at *1 (annual salary of $95,000). Accordingly, Davenport's similarly high salary is consistent with a finding that he qualifies for the exemption.

Finally, the court acknowledges Davenport's contention that his responsibilities included non-exempt tasks such as powering servers on and off, racking and decommissioning servers, installing software, running security patches, and escorting vendors. However, even

accepting that as true, it is clear that Davenport's "primary duties" at the Data Center fell within the exemption. See Williams, 809 F.3d at 111 (explaining that an employee fell within the exemption even though some of her "duties fell under the rubric of nonexempt work," given that such duties amounted to only a "small portion of her overall job duties"); Bobadilla, 2005 WL 2044938, at *7 (concluding that, even if the employee "spent much of his time on lesser-skilled tasks," a reasonable jury could still conclude that his primary duty was exempt work); Friedman, 2018 WL 1954218, at *4 (noting that an employee is exempt "even assuming that [he] spent a significant amount of time moving equipment and laying cables").

Accordingly, the court concludes that Davenport was properly classified as exempt under the Computer Professional Exemption and, accordingly, HirePower's motion for summary judgment on Davenport's FLSA claim is **GRANTED**.

### B.  State Law Claims

HirePower also moves for summary judgment on all three of Davenport's state law claims. These claims are based on Davenport's reduction in pay from $50 to $40 per hour in May 2017, when Artech informed HirePower that it was reducing its bill rate for Davenport's services. Davenport asserts that Artech instructed HirePower to reduce Davenport's rate by only $5 per hour (to $45 per hour) and that HirePower breached its contract with Artech by subsequently paying Davenport only $40 per hour. He alleges that HirePower's decision to pay Davenport $40 per hour is wage theft in violation of the Virginia Wage Payment Act, Va. Code § 40.1-29 (Count Two), and that he is entitled to recover for HirePower's breach of contract with Artech as the intended third-party beneficiary (Count Three), or, in the alternative, under the equitable doctrine of unjust enrichment (Count Four).

### 1.     Virginia Wage Payment Act

HirePower argues that the court should grant summary judgment on Davenport's Virginia Wage Payment Act ("VWPA") claim because the VWPA does not give Davenport a private right of action to sue for a particular hourly rate or, in the alternative, because the claim is partially time-barred. Contrary to HirePower's position, it is well-settled that the VWPA, as amended in 2020, now provides a private right of action for employees to sue their employers for unpaid wages. Va. Code §§ 40.1-29(G), (J); see, e.g., Naidu-McCown v. Emergency Coverage Corp., No. 3:23-cv-390, 2024 WL 1253861, at *4 (E.D. Va. Mar. 22, 2024) ("As amended in 2020, the VWPA permits employees to sue their employers for failing to pay wages for all hours worked."); Nelson v. Area Wide Protective, Inc., No. 121-cv-895, 2021 WL 10352732, at *7 (E.D. Va. Dec. 8, 2021) (acknowledging that a private right of action under the VWPA became effective on July 1, 2020); Lattimore v. Brahmbhatt, No. 4:21-cv-038, 2024 WL 26687, at *6 n.11 (W.D. Va. Jan. 3, 2024) (Cullen, J.) (providing that an allegation of unpaid wages is actionable under the VWPA).

Since the 2020 amendment, courts have recognized that a cause of action exists under the VWPA where an employee alleges that their employer withheld part of their pay or otherwise failed to compensate them for hours worked. See, e.g., Stacy v. Jennmar Corp. of Va., Inc., No. 1:21-cv-015, 2022 WL 1442247, at *2 (W.D. Va. May 6, 2022) (Jones, J.) (certifying a class in which the plaintiffs allege that they were not compensated for work completed before their shifts); Sands v. Blue Ridge Rock Festival, No. 6:22-cv-056, 2023 WL 3097223, at *1 (W.D. Va. Apr. 26, 2023) (Moon, J.) (granting the motion for conditional class certification where bartenders at a festival alleged that their employer failed to pay them

minimum wages and overtime premium wages, and unlawfully withheld their tips); <u>Avila v. Marlin Lighting LLC</u>, No. 22-cv-49, 2022 WL 17094583, at *3 (D. Md. Nov. 21, 2022) (granting default judgment under the VWPA for employees who were not paid overtime premium); <u>Naidu-McCown</u>, 2024 WL 1253861, at *4 (denying the employer's motion to dismiss the employees' VWPA claim where the employees alleged that the employer failed to compensate them for "off-the-clock" work activities).

However, a cause of action does not exist where pay was not withheld or where the alleged "failure to pay was because of a bona fide dispute between the employer and its employee." <u>Racklin v. Zeta Glob. Corp.</u>, 628 F. Supp. 3d 625, 647 (E.D. Va. 2022), <u>aff'd</u>, No. 22-2077, 2023 WL 5165281 (4th Cir. Aug. 11, 2023) (quoting Va. Code § 40.1-29(D)); <u>see also</u> <u>Nestler v. Scarabelli</u>, 77 Va. App. 440, 466, 886 S.E.2d 301, 314 (2023) (concluding that the VWPA did not apply because the defendants "paid Scarabelli his full salary and did not withhold wages").

Here, Davenport argues that HirePower violated the VWPA by reducing his pay to $40 per hour, when Artech's agreement with HirePower entitled Davenport to $45 per hour. However, it is undisputed that Davenport agreed to reduce his pay to $40 per hour given that, otherwise, HirePower was preparing to terminate him. <u>See</u> Exh. U, ECF No. 62-38 ("I just spoke with Walter and he said he knew something was coming as they are moving a lot to India. He is willing to take $40.00 . . . ."); <u>see also</u> Exh. T, ECF No. 62-37 (showing that, before Davenport agreed to the pay cut, Celeste Glass emailed, "Yes, please let [Davenport] know that he is terminated effective Friday"); Celeste Glass Dep., 75:12-22 ("[M]y intention . . . [with] the wage reduction was that we were either going to make money off of

him or he was going to leave. . . . He would not be an employee of HirePower anymore.").
Importantly, Davenport does not allege that HirePower withheld any of the wages owed to
him pursuant to the agreed-upon $40 hourly rate or that HirePower failed to compensate him
for time worked. In other words, HirePower paid Davenport wages for all time worked at the
$40 hourly rate to which he explicitly agreed to be paid for that time worked.

Moreover, even construing HirePower's subsequent refusal to provide Davenport the
backpay he demanded in 2022 as withholding earned wages under the VWPA, such
withholding was the result of a "bona fide dispute between the employer and employee." See
Exh. 22, ECF No. 70-46 ("In regard to your question about backpay, the current situation is
an issue between HirePower and Artech. You will not be receiving any form of backpay, we
are comfortable with the documentation that exists."). Accordingly, the appropriate vehicle
for Davenport to seek redress is his breach of contract claim, where he seeks resolution of
whether he was entitled to an hourly rate of $45 instead of $40 under HirePower's agreement
with Artech. The court will **GRANT** HirePower's motion for summary judgment as to
Davenport's VWPA claim.

### 2.  Breach of Contract as a Third-Party Beneficiary

HirePower next argues that Davenport's breach of contract claim fails because he was
not an intended beneficiary of HirePower's agreement with Artech.[4] Under Virginia law, "a

---

[4] In briefing, HirePower also argued that its agreement with Artech did not obligate HirePower to pay
Davenport $45 per hour because the agreement did not apply to Davenport. Def.'s Mem. Supp. Summ. J., ECF
No. 62, at 18. At the April 12, 2024, hearing on these motions, however, counsel for HirePower conceded that
HirePower breached the agreement with Artech by reducing Davenport's pay. Specifically, HirePower
conceded that it breached the provision that states, "Subcontractor agrees that it will <u>not</u> reduce the direct labor
rate and/or benefits paid to its employees as a result of any reduction in bill rates or implementation of rebates
or other charges as imposed by the Customer under this Subcontract." Exh. 11, ECF No. 59-23, at 7 (emphasis
in original). The court notes that, to prevail on this claim at trial, Davenport must still prove that the agreement

third party's right to claim relief as the beneficiary of a contract between others requires evidence that the contracting parties intended to confer a benefit upon that particular claimant." Ward v. Ernst & Young, 246 Va. 317, 331, 435 S.E.2d 628, 635 (1993).[5] Indeed, "[t]he essence of a third-party beneficiary's claim is that others have agreed between themselves to bestow a benefit upon the third party but one of the parties to the agreement fails to uphold his portion of the bargain." Copenhaver v. Rogers, 238 Va. 361, 367, 384 S.E.2d 593, 596 (1989).

In contrast, "[a] mere incidental beneficiary of a contract does not have standing to sue on the contract." Kelley v. Griffin, 252 Va. 26, 29, 471 S.E.2d 475, 477 (1996). "While a contract may expressly state such an intent to benefit a third party, evidence of such intent need not be limited to the four corners of the contract." Tingler v. Graystone Homes, Inc., 298 Va. 63, 105, 834 S.E.2d 244, 268 (2019) (concluding that the circuit court erred in determining that the plaintiff was not an intended third-party beneficiary because the benefits to the plaintiff were an "integral part of the obligations assumed" under the contract); see also In re Remington Park Owners Ass'n, Inc., 548 B.R. 108, 123 (Bankr. E.D. Va. 2016) (explaining that, although the plaintiff was identified as the service provider that would make

---

required HirePower to pay Davenport a $45 hourly wage—in other words, that HirePower breached the contract by failing to pay Davenport $45.

[5] Referencing the choice of law provision in the agreement with Artech, Davenport asserts that this issue is governed by New York law. Pl's Mem. Opp'n Def.'s Mot. Summ. J., ECF No. 70, at 31. However, Davenport and HirePower both contend that the result is the same under either New York or Virginia law. Indeed, on the issue of intended third-party beneficiaries, it does not appear that New York and Virginia law differ to any meaningful extent. See, e.g., Debary v. Harrah's Operating Co., 465 F. Supp. 2d 250, 263 (S.D.N.Y. 2006), aff'd sub nom. Catskill Dev., L.L.C. v. Park Place Ent. Corp., 547 F.3d 115 (2d Cir. 2008) ("Under New York law, in order to recover as a third-party beneficiary of a contract, a claimant must establish that the parties to the contract intended to confer a benefit on the third party."). Under either the law of New York or Virginia, the disputed facts of this case preclude the court from granting summary judgment to HirePower on the issue of third-party beneficiary as a matter of law.

communication services available to a group of homeowners under a contract between the homeowners and a contractor, "any benefit to [the plaintiff] as the initial third-party service provider is merely incidental").

Here, there is evidence that HirePower and Artech entered into the agreement with the express intention of benefitting Davenport—namely, "to keep [Davenport] employed." Smith Dep., 54:7-19; see also David Glass Dep., 52:3-9 (explaining that they entered into the agreement because "Artech wanted to continue utilizing [Davenport's] services"); Exh. E, ECF No. 86-13 (stating that HirePower was motivated to engage with Artech on the agreement because it "would love to continue billing for Mr. Davenport").

Further, a provision in the contract ensures that the parties may not lower Davenport's rate, another benefit that flows directly to Davenport, though the parties dispute whether HirePower and Artech agreed to that provision expressly for Davenport's benefit, or for another reason, such as compliance with applicable laws. Exh. 11, ECF No. 59-23, at 7 ("Subcontractor agrees that it will not reduce the direct labor rate and/or benefits paid to its employees as a result of any reduction in bill rates or implementation of rebates or other charges as imposed by the Customer under this Subcontract." (emphasis in original)).

Moreover, while the agreement could be used for future HirePower employees, Davenport was the only employee that HirePower provided to Artech, which suggests that the parties had Davenport specifically in mind when it negotiated the terms. Smith Dep., 50:12-17 ("Q: And you never had any new hires; right? A: No. Q: So for roughly six years, Walter Davenport was the only employee of HirePower under contracts either with CTG or Artech; right? A: Correct."). In fact, Rose Smith, a corporate designee for HirePower, testified

25

that HirePower had no intention of "do[ing] any new business with Artech." Smith Dep., 54:4-19. Instead, as explained above, the agreement was "to keep [Davenport] employed." Smith Dep., 54:4-19 ("We were not going to change Walter, and we weren't going to have a new hire . . . .").

Accordingly, viewing the facts and resolving all inferences in favor of Davenport on this claim, the court finds that a reasonable jury could conclude that Davenport was the intended third-party beneficiary under HirePower's agreement with Artech, and the court will **DENY** HirePower's motion for summary judgment as to that count.

### 3. Unjust Enrichment

Finally, HirePower argues that Davenport's unjust enrichment claim should not survive summary judgment because a contract governs the dispute regarding his hourly wages. Indeed, under Virginia law, unjust enrichment is an action in implied contract, meaning that the "existence of an express contract covering the same subject matter of the parties' dispute precludes a claim for unjust enrichment." CGI Fed. Inc. v. FCi Fed., Inc., 295 Va. 506, 519, 814 S.E.2d 183, 190 (2018). Davenport, however, has pled the unjust enrichment claim as an alternative to breach of contract. Accordingly, if the jury finds that Davenport cannot recover under breach of contract, the jury could instead conclude that he is entitled to recover based on principles of equity under his unjust enrichment claim. In other words, while HirePower is correct that Davenport cannot recover under both claims because they are mutually exclusive, Davenport can present both to the jury at trial, and the court will not grant summary judgment for HirePower on that basis. See, e.g., Nat'l Funding, Inc. v. Mod. Renovations, LLC, No.

5:20-cv-058, 2024 WL 266543, at *5 (W.D. Va. Jan. 24, 2024) (allowing the breach of contract and unjust enrichment claims to both survive summary judgment).

HirePower also argues that Davenport cannot establish an unjust enrichment claim because he cannot show that HirePower accepted or retained a benefit from Davenport without paying for its value. To succeed on an unjust enrichment claim in Virginia, a plaintiff must show that: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value." James G. Davis Constr. Corp. v. FTJ, Inc., 298 Va. 582, 597, 841 S.E.2d 642, 650 (2020).

Davenport asserts that his claim should survive because the evidence establishes that (1) he conferred a benefit on HirePower by providing it with labor at a value of $45 per hour, (2) HirePower accepted and retained that benefit knowing it was retaining from Davenport $5 in wages per hour worked, and (3) that it was inequitable for HirePower to retain the $5 hourly benefit to which it was not entitled. The court agrees with Davenport that, to the extent a jury finds that he is not entitled to recover for HirePower's alleged breach of contract with Artech, a reasonable jury should instead decide whether HirePower was unjustly enriched by failing to pay Davenport the extra $5 hourly wages to which he was arguably entitled. Accordingly, HirePower's motion for summary judgment on Davenport's unjust enrichment claim is **DENIED**.[6]

---

[6] Davenport argues that he is entitled to summary judgment on HirePower's twenty-second defense, in which HirePower contends that Davenport's state law claims are barred by the doctrines of waiver, laches, unclean hands, and/or estoppel. Def.'s Answer, ECF No. 15, at 11. Because the court has concluded that Davenport's breach of contract and unjust enrichment claims survive summary judgment, the court will not foreclose HirePower's defenses to these claims as a matter of law. HirePower may seek to introduce evidence supporting these defenses at trial.

## IV. CONCLUSION

For the foregoing reasons, HirePower's Motion for Summary Judgment, ECF No. 61, is **GRANTED** as to Davenport's FLSA and VWPA claims (Counts One and Two) and **DENIED** as to Davenport's breach of contract and unjust enrichment claims (Counts Three and Four). Davenport's Partial Motion for Summary Judgment, ECF No. 58, is **DENIED**. The case remains set for a jury trial on May 9–10, 2024, on Davenport's claim for breach of contract and alternative claim for unjust enrichment.

An appropriate order will be entered.

Entered: April 19, 2024

Michael F. Urbanski
Chief United States District Judge

28